AZRA MEHDI (SBN 220406)
azram@themehdifirm.com
THE MEHDI FIRM, PC
95 Third Street
2nd Floor No. 9122
San Francisco, CA 94103
Ph/Fax: 415.905.8880
Attorney for Plaintiffs

[additional counsel appears on signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| LORNE TRITT, BRUCE JOHNSON, and JOSEPH FISHMAN, *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>3Commas Technologies OÜ,<br><br>Defendant. | Case No.: _____<br><br>**CLASS ACTION COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Lorne Tritt, Bruce Johnson, and Joseph Fishman (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action against Defendant 3Commas Technologies OÜ ("3Commas" or "Defendant"), based on their personal knowledge and the investigation of counsel, alleging as follows:

**I.      INTRODUCTION**

1.      This is a class action brought by Plaintiffs on behalf of themselves and the thousands of similarly situated persons whose cryptocurrency account trading credentials were acquired and/or accessed by unauthorized persons in a data breach (or data breaches) that 3Commas admitted on December 28, 2022 (the "Data Breach").

2. Cryptocurrencies, such as Bitcoin, can be traded on centralized exchanges. Exchange account holders can make trades directly within their exchange account (such as on Coinbase or Binance) or set up an automated trading "bot" to send trade requests to their exchange account for execution on the exchange. A trader can instruct the trading bot in advance to execute a trading strategy where cryptocurrencies are bought/sold when certain conditions are met. The bot receives price information from exchanges about the prices of cryptocurrencies on that exchange. Then, based on triggers or signals in the trading prices of cryptocurrencies, the bot executes commands to buy and/or sell cryptocurrencies in the user's exchange account.

3. 3Commas claims to be the largest crypto trading bot platform, having achieved $225 billion in trading volume in 2021 and now over 220,000 monthly users.[1] Further, it boasts that "each month over 70% of 3Commas users get profit from closing the deals through the platform."[2]

4. 3Commas assures users that its advanced trading bots are secure: "3Commas only interacts with exchanges using API keys. Your funds are secure because we do not have your credentials and cannot initiate withdrawals." The 3Commas website adds: "Our . . . bots are proven performers that execute your trading strategy at scale. The market never sleeps, and neither do our bots."[3]

5. 3Commas charges consumers fees to use its automated trading platform. 3Commas charges $29 per month for the "Starter" subscription plan, $49 per month for the "Advanced" subscription plan, and $99 per month for the "Pro" plan.[4]

6. 3Commas claims to integrate with most any exchange – including Coinbase's exchange in the United States. Around November 2022, 3Commas reported it has a "customer base of over 100,000 active traders."[5]

---

[1] https://3commas.io/about; https://3commas.io/blog/best-crypto-trading-tools
[2] https://www.businesswire.com/news/home/20220922005579/en/CORRECTING-and-REPLACING-Largest-Crypto-Trading-Bot-and-Investment-Platform-3Commas-Raises-37M-in-Series-B-Funding-Round; see https://twitter.com/3commas_io (The 3Commas Twitter account describes the company as the "Largest #crypto trading platform providing traders with ultimate control over their positions on crypto exchanges.")
[3] https://3commas.io/ (last accessed January 26, 2023)
[4] https://3commas.io/pricing
[5] https://3commas.io/blog/october-19-phishing-attack-post-mortem

**II. THE PARTIES**

    **A.  Plaintiffs**

3. Plaintiff Lorne Tritt ("Mr. Tritt") is a citizen of the state of Georgia.

4. Plaintiff Bruce Johnson ("Mr. Johnson") is a citizen of the state of Florida.

5. Plaintiff Joseph Fishman ("Mr. Fishman) is a citizen of the state of New Jersey.

6. Plaintiffs used accounts with 3Commas for trading on centralized exchange(s).

7. Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all persons similarly situated and proximately damaged by the unlawful conduct described herein.

    **C.  Defendant 3Commas**

8. Defendant 3Commas Technologies OÜ is an Estonian Private Limited Company. It has an office in Estonia at Harju maakond, Tallinn, Kesklinna linnaosa, Laeva tn 2, 10111, and the 3Commas website reports there are over 270 employees worldwide. Upon information and belief, 3Commas has multiple employees in the United States, and at least one member of the 3Commas Leadership Team, Jacob Schwartz (VP of Customer Experience) resides and works in the United States.

**III. JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The aggregate amount-in-controversy, exclusive of costs and interests, exceeds the sum of $5,000,000.00. This is a class action in which at least one member of the proposed class is a citizen of a state different than Defendant.

10. This Court has personal jurisdiction over Defendant because Defendant routinely conducts business in California and has sufficient minimum contacts in California to have intentionally availed itself to this jurisdiction by marketing and selling the 3Commas platform in California.

11. Further, Defendant's data server(s) – where Defendant stores, processes, and delivers data that customers input on its website – are provided by Cloudflare, Inc., which has its

principal executive offices in San Francisco.[6] Defendant also uses or has used Amazon Web Services, Inc. ("AWS"), to store and safeguard sensitive user data.[7] The Coinbase exchange, which the 3Commas platform receives market information from and sends trade commands to, also uses AWS services to operate its exchange.[8] Upon information and belief, both Cloudflare and AWS have data centers in this District.

12.  Venue is proper in this District under 28 U.S.C. § 1391 because, *inter alia*: (a) Defendant conducts substantial business in this District, (b) Defendant directed its services at residents in this District, and (c) events that give rise to this action took place in this District.

**IV.  FACTUAL ALLEGATIONS**

13.  The 3Commas website markets its trading management platform as allowing "users to deploy automated trading bots to execute non-stop cryptocurrency trading, minimize risks, and shop the marketplace for bot presets."[9] To do that, 3Commas requires users to connect their 3Commas account to the user's exchange account(s) via a secret API key.

14.  3Commas did not live up to its promises to protect users.

15.  A hacker or hackers obtained thousands of sensitive API keys (and potentially other personal information) for thousands of current or former users of 3Commas.

**A.  3Commas Integrates with Exchange Accounts Through API Keys**

16.  3Commas connects to a user's account on a cryptocurrency exchange, such as the user's Coinbase Pro account or Binance account, by using an application programming interface ("API") key – credentials comprised of long strings of characters. Upon a user's request, the user's exchange supplies API key credentials for directly interacting with the user's account at the exchange. Then, the user inputs the API key credentials in his or her 3Commas account.

17.  When 3Commas sends requests for market information or requests for trades to the user's exchange account, the exchange uses the API key to authenticate those requests.

---

[6] https://3commas.io/blog/fake-screenshot-cloudflare-logs
[7] https://3commas.io/blog/december-10-update-on-investigation-api-key-exchange-attacks
[8] https://aws.amazon.com/solutions/case-studies/coinbase/
[9] https://3commas.io/about (last accessed September 8, 2023)

18.     After linking an exchange account to 3Commas, the user can trade, but 3Commas promises it "will not have access to transfer or withdraw your assets. Each exchange connects with encrypted API keys[.]"[10]

**B. 3Commas Promises to Protect Users and Belatedly Admits to the Data Breach**

19.     The 3Commas Privacy Policy, dated September 14, 2022, promises:

> We have taken necessary technical and organizational security measures to protect your personal data against accidental or unlawful destruction, loss or alteration and against the unauthorized disclosure, abuse or other processing in violation of applicable law.[11]

20.     In a blog post, 3Commas's co-founder represents: "Your funds are secure because they can't leave your exchange. ….3Commas secures user data with encrypted API keys and enterprise-grade tools from security services provider Cloudflare, including: Web Application Firewall[,] DDOS attack protection[,] SSL/TLS encryption between visitors and origin servers." He concluded by boasting: "5 years in the crypto industry without any serious data breaches. That's a testament to how seriously we take security at 3Commas. Every blockchain and cryptocurrency service is a tempting target for malicious attacks, and 3Commas operates under the assumption that someone is always trying to get access to our user's information. We take every reasonable precaution to block these attacks before they happen and ensure your accounts are safe."[12]

21.     Beginning around October 2022, 3Commas users began noticing that their holdings had been depleted from their accounts on various cryptocurrency exchanges, including Binance, Coinbase, and FTX.  The losses occurred as a result of thousands of unauthorized trades where obscure, low-liquidity coins were bought and quickly re-sold for a loss in the victim's account.  By orchestrating both sides of those trades within a short period of time, a third-party can use the trades to move value from the victim's exchange account to his exchange account.  Often the unauthorized trades are executed at night when the account owner is unlikely to see the trades as they happen.

---

[10] https://help.3commas.io/en/articles/3108971-connect-an-exchange-using-an-api-key
[11] https://3commas.io/privacy-policy-before-23092022 (last accessed September 8, 2023)
[12] https://3commas.io/blog/3commas-security (dated March 8, 2022)

CLASS ACTION COMPLAINT
-5-

22. By November 2022, 3Commas had identified at least 48 of its customers whose exchange account holdings had essentially been traded-away in unauthorized transactions. 3Commas insisted that "there have been no breaches of 3Commas' account security and API encryption systems," criticizing signs of the Data Breach as "False Rumors" and emphasizing "3Commas traders are safe."[13]

23. 3Commas continued to stridently deny a data breach, decrying claims its employees stole API keys as "fake" claims made with "falsified evidence."[14]

24. On or about December 28, 2022, an anonymous hacker claimed he had obtained around 100,000 API keys belonging to 3Commas users and published over 10,000 of the API keys as proof of the hack. The hacker vowed to publish the rest of the 100,000 API keys in the upcoming days.[15]

25. At that point, 3Commas could no longer deny the Data Breach and was forced to confront the leak. Yuriy Sorokin admitted in a Tweet on December 28, 2022 that "We saw the hacker's message and can confirm that the data in the files is true…"[16]

26. On December 29, 2022, 3Commas published a "Notice of API data disclosure incident" that admitted to the Data Breach.[17] The notice stated (in part):

> On 28 December 2022 there was a post made on the Pastebin website, that has since been taken down, from a supposed hacker claiming that they had got access to API data stored in 3Commas' database. 3Commas can confirm that 3Commas first found out about the hacking and the hacker's statement from the same Pastebin post as the rest of the 3Commas community.

---

[13] RE: False Rumors of API Leaks or Exposure of our Database, https://3commas.io/blog/response-to-false-rumors-api-leaks (dated Nov. 23, 2022). Earlier in November, 3Commas similarly denied it had suffered any data breach, stating "There were no breaches of the account security and API encryption systems of 3Commas or our partner exchanges." See https://3commas.io/blog/october-19-phishing-attack-post-mortem (originally published on Nov. 1, 2022).
[14] See https://3commas.io/blog/fake-screenshot-cloudflare-logs (dated Dec. 11, 2022); https://3commas.io/blog/december-10-update-on-investigation-api-key-exchange-attacks (dated Dec. 11, 2022).
[15] See https://www.coindesk.com/tech/2022/12/28/anonymous-twitter-user-leaks-alleged-3commas-api-database/; https://3commas.io/blog/notice-on-api-data-disclosure-incident (dated Dec. 29, 2022).
[16] https://twitter.com/YS_3Commas/status/1608202390121111552
[17] https://3commas.io/blog/notice-on-api-data-disclosure-incident (dated Dec. 29, 2022).

> . . .
>
> At this point, 3Commas can unfortunately confirm that some of 3Commas' users' API data (API keys, secrets and passphrases) have been disclosed by a third party. Currently and to the best of our knowledge only API data have been disclosed as part of this incident. As a likely consequence the hacker(s) may use or may have used the API data to connect your exchange accounts to his/their account and/or initiate unauthorized trades.
>
> . . .
>
> 3Commas acknowledges that in the Pastebin post the hacker alleged in a way that some 3Commas' employee has sold to them the above-mentioned user data . . .

27. In a post published January 1, 2023 (and updated January 6, 2023), 3Commas admitted: "we believe [the Data Breach] took place in October/November time frame."[18]

28. 3Commas failed to prevent, detect, and promptly disclose the Data Breach.

**C. Plaintiffs Suffered Harm**

29. Mr. Tritt linked his 3Commas account to his Coinbase account using an API key stored in his 3Commas account. On October 30, 2022, numerous unauthorized trades occurred in Mr. Tritt's Coinbase account. As a result of numerous unauthorized buys and sells of the same cryptocurrencies within a very short period of time, Mr. Tritt's Coinbase account was depleted by approximately $2 million worth of cryptocurrency/funds.

30. Mr. Johnson linked his 3Commas account to his Coinbase account using an API key stored in his 3Commas account. On November 7, 2022, numerous unauthorized trades occurred in Mr. Johnson's Coinbase account. As a result of numerous unauthorized buys and sells of the same cryptocurrencies within a very short period of time, Mr. Johnson's Coinbase account was depleted by approximately $400,000 worth of cryptocurrency/funds.

31. Mr. Fishman linked his 3Commas account to his Coinbase account using an API key stored in his 3Commas account. On November 7, 2022, numerous unauthorized trades occurred in Mr. Fishman's Coinbase account. As a result of numerous unauthorized buys and sells of the same cryptocurrencies within a very short period of time, Mr. Fishman's Coinbase account was depleted by approximately $287,363 worth of cryptocurrency/funds.

---

[18] https://3commas.io/blog/api-security-incident-faq

32. Plaintiffs also suffered other damages, including but not limited to loss of privacy, lost time from effort expended to secure accounts after discovering unauthorized transactions, and lost opportunities to trade in their cryptocurrency exchange accounts.

## V. CLASS ACTION ALLEGATIONS

33. Plaintiffs bring this action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following class (collectively, the "Class"):

> All persons residing in the United States whose personal information and/or API keys were exfiltrated as a result of a breach of 3Commas' information system(s).

34. The following individuals and entities are excluded from the proposed Class: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

35. The proposed Class meets the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

36. **Numerosity**: The proposed Class is believed to be so numerous that joinder of all members is impracticable.  Upon information and belief, the total number of Class members is in the thousands of individuals, if not more.  Membership in the Class will be determined by analysis of Defendant's records.

37. **Typicality**: Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs and all members of the Class were injured through Defendant's uniform misconduct.  The same event and conduct that gave rise to Plaintiffs' claims are identical to those that give rise to the claims of every other Class member because Plaintiffs and each member of the Class had their personal information, API data, and/or other sensitive information compromised in the same way by the same conduct of Defendant.

38. **Adequacy**: Plaintiffs are adequate representative of the Class because their interests do not conflict with the interests of the Class that each seeks to represent; Plaintiffs have retained counsel competent and highly experienced in data breach class action litigation; and Plaintiffs and Plaintiffs' counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

39. **Superiority**: A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult, if not impossible, for members of the Class individually to effectively redress Defendant's wrongdoing. Even if Class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

40. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

    a.    Whether Defendant engaged in the wrongful conduct alleged herein;

    b.    Whether Defendant failed to adequately safeguard Plaintiffs and Class members' personal information and API data;

    c.    Whether Defendant owed a duty to Plaintiffs and the Class to adequately protect their personal information and API data, and whether they breached this duty;

    d.    Whether Defendant's systems, networks, and data security practices used to protect Plaintiff's and Class members' sensitive information violated the FTC Act,

and/or Defendant's other duties discussed herein;

e. Whether Defendant knew or should have known that their computer and network security systems were vulnerable to a data breach;

f. Whether Defendant's conduct, including their failure to act, resulted in or was the proximate cause of the Data Breach;

g. Whether Defendant breached duties to Plaintiffs and the Class to use reasonable care in protecting their PII;

h. Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and the Class;

i. Whether Defendant continues to breach duties to Plaintiffs and the Class;

j. Whether Plaintiffs and the Class suffered injury as a proximate result of Defendant's negligent actions or failures to act;

k. Whether Plaintiffs and the Class are entitled to recover damages, equitable relief, and other relief;

l. Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiffs, Class members, and the public;

m. Whether Defendant's actions alleged herein constitute gross negligence; and

n. Whether Plaintiffs and Class members are entitled to punitive damages.

41. This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members and making final injunctive relief appropriate with respect to the Class in their entireties. Defendant's policies challenged herein apply to and affect Class members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class in their entireties, not on facts or law applicable only to Plaintiffs.

42. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the sensitive personal and account information of Class Members, and Defendant may continue to act unlawfully as set forth in this Complaint.

## VI. CLAIMS FOR RELIEF ON BEHALF OF PLAINTIFFS AND THE CLASS

### FIRST CAUSE OF ACTION
### Negligence

43. Plaintiffs incorporate by reference paragraphs 1 to 42 above.

44. Defendant owed Plaintiffs and the Class members a duty of care, *inter alia*, to act with reasonable care to secure and safeguard the API data of Plaintiffs and Class Members and to use commercially reasonable methods to do so. Defendant took on this obligation upon accepting and storing the information provided by Plaintiffs and Class members.

45. Defendant breached its general duty of care to Plaintiffs and Class members in at least the following ways:

a. failing to exercise reasonable care in obtaining, retaining, securing, and protecting API keys in its possession;

b. failing to protect Plaintiffs' and Class members' API keys in its possession by using reasonable and adequate security procedures and systems;

c. failing to exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendant's networks, systems, protocols, policies, procedures, and practices to ensure that Plaintiffs' and Class members' API keys were adequately secured from impermissible access, viewing, release, disclosure, and publication;

d. failing to consistently enforce security policies aimed at protecting Plaintiffs' and the Class members' API keys;

e. failing to implement processes to quickly detect a data breach, security incident, or intrusion; and

f. failing to promptly notify Plaintiffs and Class members of any data breach, security incident, or intrusion that affected or may have affected their API keys or other personal information.

46. There is a close causal connection between Defendant's failure to implement security measures to protect the API data of Plaintiffs and the Class, on the one hand, and the harm suffered by Plaintiffs and the Class, on the other hand.  Plaintiffs' and Class members' API key data was accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such information by adopting, implementing, and maintaining appropriate security measures.

47. In addition to its duties under common law, Defendant had additional duties imposed by statute and regulations, including duties under the FTC Act.  Pursuant to the FTC Act, 15 U.S.C. § 45(a), Defendant owed a duty to Plaintiffs and Class members to provide fair and adequate computer systems and data security to safeguard the API keys of Plaintiffs and Class members.

48. Plaintiffs and Class members are within the class of persons that the FTC Act was intended to protect.  The harm that occurred because of the Data Breach is the type of harm the FTC Act was intended to guard against.

49. Defendant violated the FTC Act by failing to use reasonable measures to protect the API keys of Plaintiffs and Class members and by not complying with applicable industry standards, as described herein.

50. Defendant breached its duties to Plaintiffs and Class members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiffs' and Class members' API keys and exchange accounts.

51. Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

52. As a result of Defendant's negligence and negligence *per se*, Plaintiffs and Class members have suffered injury, as alleged herein, including but not limited to (a) the compromise, publication, and/or theft of their API keys; (b) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized transaction in their account and re-securing their accounts; (c) lost opportunity costs associated with the effort expended and the loss of productivity and trading capabilities while having to address the actual and future consequences of

the Data Breach; and (d) the diminished value of Defendant's services Plaintiffs and other members of the proposed class paid for and received.

## SECOND CAUSE OF ACTION
**Fraud**

53. Plaintiffs incorporate by reference paragraphs 1 to 42 above.

54. 3commas deceived its customers by misrepresenting the security of customer data and withholding information.

55. 3Commas knowingly or recklessly deceived its users by denying a data breach of its systems compromised customer API keys, insisting that "there have been no breaches of 3Commas' account security and API encryption systems."

56. 3Commas's representations about its security and the Data Breach were false when made.

57. 3Commas knew its representations about its security and the Data Breach were false when it made them, or it made those representations recklessly and without regard for their truth.

58. After the Data Breach, 3Commas knew or should have known that customer data had been compromised and customer accounts were vulnerable.

59. Plaintiffs reasonably relied on 3Commas's representations about its security and representations denying the Data Breach.

60. As a result of Plaintiffs' and Class Members' reliance on Defendant's misrepresentations, Plaintiffs and Class members have suffered injury, as alleged herein, including but not limited to (a) the compromise, publication, and/or theft of their personal API keys; (b) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized transaction in their account and re-securing their accounts; (c) lost opportunity costs associated with the effort expended and the loss of productivity and trading capabilities while having to address the actual and future consequences of the Data Breach; and (d) the diminished value of Defendant's services Plaintiffs and other members of the proposed class paid for and received.

**THIRD CAUSE OF ACTION**
**Breach of Fiduciary Duties**

61. Plaintiffs incorporate by reference paragraphs 1 to 42 above.

62. As a cryptocurrency trade management platform and custodian of API data for its customers' accounts on exchanges, 3Commas has a fiduciary relationship with Plaintiffs and Class Members, and it must exercise the fiduciary duties it therefore owes with the utmost good faith, integrity, and in the best interest of Plaintiffs and Class Members.

63. As the custodian of their valuable assets, Plaintiffs and Class Members trusted 3Commas to ensure the protection, security, and success of trading in their exchange accounts.

64. As discussed herein, 3Commas represents that it will safeguard user data, including API keys, and its bots will watch over accounts while users sleep.

65. 3Commas owed a fiduciary duty to timely notify Plaintiffs and Class Members of any security threats, hacking, and technological issues that present risks to their accounts and trading activity. Defendant breached its fiduciary duty owed to Plaintiffs and Class Members to protect their accounts, their transactions relating to those accounts, and their funds and cryptocurrency assets within those accounts.

66. Defendant breached its fiduciary duty to properly employ standard measures to verify the identity of users, including Plaintiffs and Class Members, to reduce the risk of security threats, hacking, and technological issues that led to Plaintiffs' and Class Members' loss of assets and loss of access to their accounts.

67. As a result of Defendant's breaches, Plaintiffs and Class members have suffered injury, as alleged herein, including but not limited to (a) the compromise, publication, and/or theft of their personal API keys; (b) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized transaction in their account and re-securing their accounts; (c) lost opportunity costs associated with the effort expended and the loss of productivity and trading capabilities while having to address the actual and future consequences of the Data Breach; and (d) the diminished value of Defendant's services Plaintiffs and other members of the proposed class paid for and received.

## FOURTH CAUSE OF ACTION
**Breach of Contract and Implied Contract**

68. Plaintiffs incorporate by reference paragraphs 1 to 42 above.

69. Defendant promised it would take "necessary technical and organizational security measures to protect [Plaintiffs' and Class members'] personal data."

70. Further, when Plaintiffs and Class members provided their API keys and personal information to Defendant in connection with cryptocurrency trading services, they entered into express and implied contracts in which Defendant agreed to comply with its statutory and common law duties to protect Plaintiffs' and Class members' API keys and personal information.

71. Defendant required Plaintiffs and Class members to provide API keys to receive cryptocurrency trading services.

72. Defendant affirmatively represented that it collected and stored the API keys of Plaintiffs and Class members in using reasonable, industry standard means.

73. Based on Defendant's representations (as described above) and the implicit understanding of the parties, Plaintiffs and Class members accepted Defendant's offers and provided Defendant with their API keys.

74. Plaintiffs and Class members would not have provided their API keys to Defendant had they known that Defendant would not safeguard their API keys and exchange accounts, as promised.

75. Plaintiffs and Class members fully performed their obligations under the contracts with Defendant.

76. Defendant breached the contracts by failing to safeguard Plaintiffs' and Class members' API keys.

77. Defendant also breached the contracts when it engaged in acts and/or omissions that are declared unfair trade practices by the FTC and state statutes and regulations. These acts and omissions included: (i) representing that it would maintain adequate data privacy and security practices and procedures to safeguard the API keys from unauthorized disclosures, releases, data breaches, and theft; (ii) omitting, suppressing, and concealing the material fact of the inadequacy

of the privacy and security protections of Defendant's information systems; and (iii) failing to disclose to Plaintiffs and Class members at the time they provided their API keys that Defendant's data security system and protocols failed to meet applicable legal and industry standards.

78. As a result of Defendant's breaches, Plaintiffs and Class members have suffered injury, as alleged herein, including but not limited to (a) the compromise, publication, and/or theft of their personal API keys; (b) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized transaction in their account and re-securing their accounts; (c) lost opportunity costs associated with the effort expended and the loss of productivity and trading capabilities while having to address the actual and future consequences of the Data Breach; and (d) the diminished value of Defendant's services Plaintiffs and other members of the proposed class paid for and received.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendant as follows:

A. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class Counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

B. A judgment in favor of Plaintiffs and the Class awarding them appropriate monetary relief, including actual and statutory damages, punitive damages, attorney fees, expenses, costs, and such other and further relief as is just and proper;

C. A judgment in favor of Plaintiffs and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law;

D. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class and the public as requested herein, including, but not limited to:

    i. Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems detected by such auditors;

  ii. Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring; and

  iii. Ordering that Defendant segment consumer data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, unauthorized parties cannot gain access to other portions of Defendant's systems;

 E. An order requiring Defendant to pay the costs involved in notifying the Class members about the judgment and administering the claims process; and

 F. An award of such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues so triable.

Dated:  September 25, 2023

                Respectfully submitted,

                By: /s/ Azra Mehdi
                AZRA MEHDI (SBN 220406)

                THE MEHDI FIRM, PC.
                95 Third Street
                2nd Floor No. 9122
                San Francisco, CA 94103
                Ph/Fax: 415.905.8880
                azram@themehdifirm.com

                HERMAN JONES LLP
                John C. Herman (Ga. Bar No. 348370)
                (to seek admission pro hac vice)
                3424 Peachtree Road N.E., Suite 1650
                Atlanta, Georgia 30326
                Telephone: (404) 504-6500
                Facsimile: (404) 504-6501
                jherman@hermanjones.com

                *Counsel for Plaintiffs*